May I please the court, it's an honor to be in front of you gentlemen. Having clerked myself with a judge on the Fifth Circuit, I know that what I shouldn't do when I get up here is read my brief. I made five to six points in our brief on behalf of the defendant, appellant Jeremy Standow, and I really want to focus on the first one primarily, unless your questions direct me otherwise. And that's the language of a plea agreement at issue in this case. And that language is found in the excerpts of record, tab one, or in my opening brief at page 25, or in my reply brief at page four, any one of those. My brief at page 25 or my reply brief at four is the language of the plea agreement. And in my briefs, the language is reproduced exactly with the exception of the bold, bolding and italicizing of certain words. The emphases are mine, and I want to make that clear. What exactly, what exactly was the testimony that was used at the trial that was first, first proffered under the plea agreement? Say it again, Judge. I'm sorry. I say, in other words, to have a case, you have to show that there was some evidence used in the second trial that the defendant disclosed under the plea agreement, right? That's correct, sir. What did he disclose under the plea agreement that was used at the trial? Thank you for the question, Judge. The answer is a great deal of evidence. When he was questioned in connection with the counterfeiting charges, he was told by his counsel he had a duty to fully cooperate. But just tell me the evidence that was used. What evidence? His identification of the witnesses that were involved in the broader conspiracy. The phone numbers he had given to the Federal officers allowing contact with the Colombian representative. The entire evidence of the prior counterfeiting charges, which he had confessed to and signed a plea agreement and all came into evidence during the subsequent drug trial of the three drug counts. Various contact persons and his confession to the Social Security agents, to the Secret Service agents, that he had, in fact, gone down to San Andreas Island in Colombia and there had made contact with this fellow, Hugo, whom he knew as Tony. And Tony had offered to sell him drugs and counterfeit money, and that he had, in fact, picked up scuba gear and brought it back. All that, he told the U.S. government in reliance on the immunity purportedly conveyed to him under the plea agreement. What immunity? The immunity, sir, conveyed by the language, no additional charges. The government agrees to refrain from filing not any additional counterfeiting charges, but any additional charges of any kind against Defendant Jeremy Allen Standout involving or arising from. Of any kind? It says. I don't remember paragraph 18 say anything about of any kind. That's my insertion. Any additional charges. Rising out of the counterfeit. Correct. You're right, Your Honor. Now, where's the immunity? The immunity is in that language. Immunity from some testimony? Immunity from filing any subsequent charges. Charges. Correct. No more charges. No more charges. No testimonial immunity. I agree with that characterization, sir. That's a point your point is well taken. Following his confession in his plea agreement. Wait a minute. Now, are you now taking the position that you're not pursuing on this appeal that your client has any testimonial immunity? Is that right? When you just told Judge Reilly that you're right and I agree with you? That's not the thrust of the appeal. The thrust of the appeal is that these three drug charges should never have been brought because the conduct that led to them occurred prior to the counterfeiting plea, which promised that no additional related charges would be filed. So the only immunity you're pursuing, if you want to call it immunity, is immunity from being prosecuted on additional charges. Right? That's the primary immunity. I mean, I want to be careful with the word immunity. I think that's right. What is there? What are the immunities? Well, I don't know if it's an immunity, but there was a failure to have a Castigar hearing to sort out the exact evidence provided by Mr. Standow. Castigar goes to the testimonial immunity. That's the reason I'm asking this question. Doesn't it? Yes, it does. But Castigar only says, you know, you can't use evidence, evidence that was given under grant of testimonial immunity against the defendant in the later proceeding. Correct. And you just told Judge Rivley, no, this plea agreement doesn't give him testimonial immunity. I don't think the plea agreement, the language, I think Judge Rivley was correct. The language that I'm highlighting goes to whether the government was wrong in bringing the three subsequent drug charges. Are you depending on something other than the language of the plea agreement in order to assert testimonial immunity? Well, there were a number of things. It was 403, 404. And there was a failure to have a Castigar hearing. So I say that the testimonial immunity is a broader issue, a more diffuse issue. And I was attempting to respond to Judge Rivley's reading of this language. So the answer is, yes, we do have an argument about testimonial immunity. Yes, we do. But I don't find that specifically recited in the language. And I was trying to respond honestly and candidly to the judge's point about the language. Can't we ground that testimonial immunity on some other understanding? Do you think of oral promises, perhaps? Where does it come from? I think it arises from the plea agreement as well. It arises from the plea agreement. I think there are separate points conceptually, but they're definitely intertwined. I agree. And if I'm being a little sloppy, I apologize. The foremost point is that specific performance is the preferred remedy for a breach of a plea agreement.  I don't think this language is ambiguous. If they had wanted to insulate him from any further counterfeiting charges, Your Honor, counterfeiting doesn't appear in here either. They could have charited that in there. They didn't. They told him, we will refrain from filing any additional charges.  I don't know. All charges. All conceivable charges. Next word is involving. That's correct. Involving or arising from. Yes. And that's really the heart of the fight in this case. Let's talk about involving and arising from. Did these three drug counts arise from his plea in the counterfeiting case? Yes, absolutely. All of the information they got initially about drug activities in this Shulwitz conspiracy Mr. Shulwitz is dead now, but he started this conspiracy in 1999. All their initial information came from my client. No, no, no. What does that mean? Wait a minute. It didn't say arising from. The defense is arising from his involvement in passing counterfeit currency. Now, how does that arise from, even though it came from your client? Yes. From Mr. Standell's involvement in passing counterfeit currency. How does it arise out of that? Let's take both those. Let's answer your question. If you ask about whether it arises from temporally in time from his passing counterfeit, the answer is it doesn't because he went down and brought in the scuba gear before, a month or two before, his friend Todd Shipman brought in the counterfeiting currency. But it does arise from. He's not charged with bringing those drugs in, right? Yes, he is. The ones that were in the scuba gear? Yes. That's exactly the basis of his charge. They never found any drugs. They never found any scuba gear. They never found any residuals. But they based it on his testimony that he had done that, which he told them once he was caught with the counterfeit money, doing clever things like paying 100 bucks for a cab and going two blocks and getting 90 and change. What's that? He was trying to get real money. Exactly. With all the brilliance of his ninth grade education, he was trying to launder the money. He got caught. And then he told them about his honeymoon two months before. And they asked him about that. His attorney promised that he would be insulated if he provided full information. He did provide full information. And then they turned around and charged him for exactly that same activity. I agree with you, Judge Tashima, that the arising from language is interesting. It does not arise from the events of the counterfeiting because they happened after. But it does arise procedurally from the counterfeiting claim. The counterfeiting plea came first. And as a direct result of the testimony he provided to them under the plea agreement, they then charged him with the drug conspiracy count and the other two counts. But that's not what the language of this little provision is. The language does not say whether it has to arise from chronologically or arise from procedurally. Arise from his statements given in connection with his cooperation. It says arising from his involvement. It did arise from his involvement. He was charged with counterfeiting. He signed a plea and he told them everything he knew about drug activity and they charged him. That arose from his counterfeiting activities. Let's look at involving, too. What does involving mean? They want to say that this says that they've only agreed not to file further counterfeiting charges. What would be the point of that? And why would he talk about all the drug activities? Why would they ask him to talk about drug activities if this was supposed to only be an immunity relating to drug activities, to counterfeiting? They didn't. They said identify this guy. Tell us about your trip to Hollywood. Tell us about the drug activities. Tell us about Jason Shulwitz. What does involving mean? It does not mean limited to. They want to read it as limited to. Involving means, and I have the definitions here. They didn't define them. Involving means to relate too closely, to include or contain as a part. Do these drug charges relate too closely, his counterfeiting activities? Of course they do. And the government repeatedly admitted it. When my client moved to sever his defense, the government came in and said you can't. All the defendants are related. This is one interconnected, intertwined conspiracy. When it came to sentencing, the government came in and said, your honor, it's all big one ball of wax. And you know what? He used the term involved. This is cited in my brief. The U.S. attorney said this conspiracy involves both drugs and both counterfeiting. Now when my client says, oh, it does? It involves both counterfeiting and drugs? Well, let's look at the plea agreement. Does the drug involve or relate to the counterfeiting? The government in that one context says no. They can't have it both ways. Involve means relate to. If we sent out requests for interrogatories to opposing counsel in the case and we said give us all documents, sir, that involve event X or person X, and they only gave us documents solely limited to that, but didn't give us documents that included other information, we wouldn't accept that. That wouldn't be a fair reading of that request. They have to give us everything that touches on it. If we had a bank robbery where a person was killed, a felony murder, and we signed a plea agreement saying that there will be no further charges brought involving the bankruptcy and then they brought a murder charge for the felony murder, of course that would be covered. Similarly, here we have admittedly all people believe a single conspiracy. My client had a very minor role. The district court concluded his role was minor. My client was not part of the group that initially set it up. But it was a conspiracy involving trying to get a source for counterfeit money and drugs in Columbia. Jason Schulwitz had this master plan. My client had just gotten married. He went down there stupidly on his honeymoon. He probably brought drugs back in scuba gear. No one knows for sure. He later on did participate in bringing counterfeit money. This was part of one sort of operation. Now, they agreed that they would not file any additional charges against him involving or arising from his counterfeiting activities. The drug stuff does arise from legally, and it does involve the counterfeiting activities. The government has said at least ten times they're part of the same factual set of events. Let's remember, Your Honor, since I'm primarily a civil lawyer, it was comforting to me to find that plea agreements are screw-like contracts. But with three beautiful caveats. Because we're talking about the defendant's sacred constitutional rights, because the government has all the power here, and because there is something of a stain on our government if they say one thing and do another, these beautiful contracts are construed in the defendant's favor. The government drafted them. The ambiguities are construed against the government. And because we're talking about someone's constitutional issues, Your Honor said in Clark that they have to be construed in favor of the defendant. In this case, if you even find that this plea agreement language is ambiguous, even if it's ambiguous, your own ruling suggests that we should set aside these three drug counts as being inconsistent with the plea agreement. We should enact specific performance and give the defendant what he was promised, that no additional charges would be filed. And that's what we're asking you to do. Do you have any other questions, or I'll reserve rebuttal? Okay. You go ahead and reserve.  Thank you very much, gentlemen. May it please the Court. My name is Russell Smoot. I'm an assistant United States attorney in Spokane, Washington, and I'm arguing on behalf of trial counsel Earl Hicks. Your Honor, the defendant raised five issues on appeal. We have spent the defendant's time at this point arguing what I would consider probably the most significant issue, whether the plea agreement was breached. The second significant issue, in my view, is the district court's action in dismissing one count and convicting on a lesser-included count. And then the three other issues follow in order of importance. I would begin the breach of plea agreement issue and take it from there. Your Honor, the authority on this, as stated by defense counsel, is United States v. Clark. And in that, interestingly enough, in United States v. Clark, the defendant entered a plea agreement concerning the theft, I believe, from a post office. Part of that plea agreement said that the United States would not bring any more charges related to the investigation. Subsequently, the defendant was charged for burglaries of a pawn shop, information that the United States didn't fully have at the time of the plea agreement. This is very similar. Certainly the charges are completely different, but this is very similar circumstances. In this case, we're looking at a plea agreement that is plain on its face and is not ambiguous when all the words are read together. For instance, in paragraph two of the plea agreement, the defendant agrees to plead guilty to the charges on the indictment. The indictment, in this case, charged with the importation. There were actually two separate indictments, but they were counterfeit charges. Secondly, in paragraph 13, the defendant agreed to cooperate fully and provide information concerning the charges in the indictment. And finally, the most important language, the significant language that brings us here today, is that in paragraph 18, the United States agreed to refrain from filing any additional charges, as noted, involving or arising from his involvement in obtaining or passing counterfeit currency. Now, the question has been raised as to whether or not the defendant's actions or the defendant's involvement in the drug conspiracy or the drug charges arises from the counterfeiting conspiracy. First, I'd like to just say that this case involved numerous co-defendants. It also involved numerous conspiracies or numerous different acts. Now, the persons that were referenced before, Jason Shulwitz, who was a co-defendant who was, in turn, murdered throughout the course, which is significant to this. He, as well as Hugo Calanzos Munoz, who was in Colombia, originally entered into a conspiracy that involved both drugs and counterfeit. Now, Jason, excuse me, Jeremy Standell became involved in that drug conspiracy by going to Colombia in May of 1999 and returning, meeting with Hugo, whom he knew as Tony, and returning with cocaine inside scuba gear. Up to that time, when you later investigated all of this, would there have been any information gleaned regarding the counterfeiting? This case originated, maybe that would be the best place to start. The case against Standell really began the beginning of this case, and that was a counterfeiting case. Mr. Standell was arrested in Las Vegas passing counterfeit currency. At the time, he indicated that he had gone down to Colombia to obtain the counterfeit currency, and he had met with Tony, a person that he had also met earlier, to obtain information about counterfeiting and drugs. Now, subsequent to that trip in May, in which he brought back the scuba gear with the drugs related to the drug conspiracy and the drug counts, he discussed a further criminal act, a further conspiracy, simply between himself and Mr. Calanzos Munoz, and subsequently a person that Mr. Standell brought into it, Todd Shipman, and that was the separate act of counterfeiting, the counterfeiting conspiracy and importation and passing. It was not related to the drug conspiracy that Mr. Standell was also involved in. Except that the government argued at trial, as you know, that all of the counterfeiting evidence should come in at the drug trial because they're all part of the same criminal episode. That's the government's position at trial, right? That is correct. Isn't that exactly the opposite of what you've been saying? No. I believe that the government's position at trial was that information concerning going down there, he met with the same source, he did meet in the same area, and that those particular items or those particular facts were inextricably intertwined. They were because they showed not only his knowledge of who he was meeting with but it showed the type of acts in bringing it into the country. Then don't they both arise from the same incident? No. They don't arise from the same. I guess in a point in time. I thought that's what you just said. Well, in a point in time, they point back to the same source. Had Jeremy Standout not gone down and met with Hugo Columbus Munoz, then that the two incidents would not have begun. So do they arise from the meeting? Correct. Yet they do not arise from the same criminal actions. This was a separate criminal action. That's parsing that paragraph 18 arising from pretty finely, isn't it? You're trying to have it both ways, I think. No. Your Honor, I think that it could – what paragraph 18 would say was that because it is arising or involving counterfeit action, which the counterfeiting importation and the passing of counterfeiting happened subsequent to that drug charge. But when he was down there, they were discussing counterfeiting, weren't they? Correct. And the drug dealers or sellers or manufacturers didn't use the counterfeiting to fund their operations? I don't know that that's necessarily within the record. I would assume that in reference to Mr. Columbus Munoz and his Colombian part of the operation, that that would be a reasonable determination. But, yeah, when Mr. Chanda went down there and his subsequent acts of pursuing the counter – passing counterfeit bills in Las Vegas, it wasn't related at all to the drug activity? It could – it was not related to the drug activity that – the drug conspiracy charge that involved Mr. Standow as well as Columbus Munoz and Mr. Shulwitz, among others. It may have – ultimately, the funds – the buy money, if the Court will, for the counterfeit money may have had a connection with Mr. Hugo Columbus Munoz as far as obtaining more drugs or not. However, that – that was a further act that would be related to Mr. Columbus Munoz in that part of the drug – supplying drugs rather than the acts of Mr. Standow. Concerning the information, the Court raised questions – I'm not sure I follow all that, but I'll take it. What about the – are you going to address the sentencing issue? Yes. The Apprendi issue? Yes, Your Honor. Concerning – first off, just factually, what happened in the case? The defendant was charged with three drug counts, importing more than 500 grams, but possessing with intent to distribute more than 500 grams of cocaine, as well as conspiracy to possess with intent to distribute more than 5 kilograms. The jury was provided jury forms that stated, first, whether or not the defendant was guilty or not guilty, and secondarily, according to Apprendi, whether or not the defendant – whether or not the counts included more than 5 kilograms or more than 500 grams. Each count included that one. However, counts two and three were charged at less. Now, the jury returned the verdict on the conspiracy count, which is relevant here, that the defendant – that the conspiracy involved more than 5 kilograms. The defendant moved pursuant to Rule 29 to dismiss that count, and the judge found that based on the evidence presented, the government had not met its burden for that amount. However, the government had met its burden, according to the court, that the defendant, while he did not conspire to possess – to distribute more than 5 kilograms, the conspiracy involved more than 500 grams. The defendant has raised the issue first. First, Your Honor, concerns Apprendi. The effect of the court's action was? The effect? Yes. Well, the effect of the court's action was that prior to the trial, that the United States had filed Section 851, Enhancement, notifying the court and the defendant of prior drug conviction. Now, if he is convicted on count – the conspiracy count, that puts a mandatory minimum sentence of 20 years based on the amount as well as the prior conviction. Also, if he's convicted on that amount, even without the 851 Enhancement, the statutory – or the statutory maximum in that case is life imprisonment. Now, because that – because Section B1A did not apply, according to the court, but Section B1B did apply, the defendant fell within the statute that would normally have a lower maximum sentence. However, the – Up to 40 years. Right. To 40 years. However, based on the provision that addresses a prior drug conviction, that increases the maximum statutory penalty under B1B again to life. So, effectively, even though Apprendi would say that the United States didn't prove the amount of 5 kilograms, therefore, it brings it down into a sentence with a lower maximum penalty, that is not the case because of the defendant's own prior convictions. The maximum statutory penalty in this case, as applied, remains life imprisonment under both B1A and B1B. Are there different mandatory minimums? Yes. That's the change. Does that make any difference under Apprendi? No, Your Honor. It does. No. Only the maximum. Yes. Why don't we just utilize B1C for any – was a negligible amount? Because that does, in fact, have lower mandatories. And I guess, Your Honor, the courts could fall back on B1C even under these circumstances because the maximum penalty under that statute is 20 years. Right. And he was sentenced to 10, so therefore – Is 10 because of the prior? Yes. So he was still sentenced within the maximum of that provision, too? Correct. I can address briefly, Your Honor, the court's actions concerning that, or I can move on to another issue. What about the CASTIGAR? Well, Your Honor, in this case – I'm sorry, Your Honor. There was not any formal or informal immunity given in this case. And interestingly enough, the defendant was called before the grand jury on January 12th of 2000, subsequent to his plea for the counterfeiting. Before he appeared before the grand jury, he was advised that he would not be asked questions concerning any drug offenses, which the United States had learned of in December, which had learned more about it, if you will, Your Honor, between the time of the plea and being called before the grand jury. He was told that he was under investigation and not to discuss the drug charges. Even being – given that circumstance, notwithstanding that circumstance, excuse me, Your Honor, that the United States agreed prior to the trial that it would not use any statements from the grand jury. So there was no formal immunity. Any immunity that the defendant argues here would be – I think would be characterized as an immunity somehow implied within the plea agreement. Well, what about U.S. versus – I think it's called Duden or Duden, which says these plea agreements amount to informal immunity agreements. Right? I guess I can only comment, Your Honor, that it's not my position that any – that there is not a circumstance of informal immunity. I think that – Well, the defendant was actually told by the agent that did anything he said, he would enjoy immunity from that statement. That was that case. Right? I think Judge Riefer is talking about Duden, right? That's right. Duden. I'm talking about Duden. He's trying to give you a basis for distinguishing. I believe so, Your Honor. That's a hell of a case. That was not the case here. In fact, I would also add, Your Honor, that the defendant was asked to appear in the United States Attorney's Office to make an identification of Mr. Colanzos of a picture and the testimony from DE agent Phil Hart, who was involved in that interview. Do you remember Duden? I cannot comment. She was assured that her statements were not subject to prosecution twice. That's a helpful question again. I would say the exact opposite happened here, Your Honor. The defendant was told that the questions concerning identification were limited. That was testified to by the agent. They were limited to identification only in the U.S. Attorney's Office, as well as his testimony before the grand jury was, in fact, limited and subsequently not used. I believe that the information that led to this investigation did not come specifically out of those statements, but came from Mr. Standow's own discussions and admissions to state-level law enforcement officers at and around the time of the disappearance of Jason Showitz, subsequent to the plea agreement. I think it's also interesting to note that within the plea agreement, while ordinarily negotiations pursuant to plea agreements are not necessarily admissible, the court made a reference to a draft of a plea agreement in which language was changed concerning drug counts. And I believe that that was also brought up in the defendant's reply brief included within that, that the defendant himself removed the language that said that he obtained drugs from Tony, who happened to be Mr. Colanzos Munoz. Instead, the language was used that he obtained information about counterfeit and drugs. I see that my time is up. If there's any further questions, I would take them otherwise. I'll take leave. All right, Mr. Spooner. Thank you. Thank you, Your Honors. Your Honor, the most ringing sentence that came from the Assistant Attorney General of the United States during his presentation was when he said, quote, The case against Jeremy Standow and the other defendants began with the counterfeiting case. That's true. It's not the case they weren't aware of drugs when they did the plea agreement concerning counterfeit. Indeed, the plea agreement itself has a sentence stating that Mr. Standow advised the United States Secret Service that he had previously traveled to San Andreas, Colombia during May of 1999 at the direction of Jason Schulwitz. Mr. Standow indicated that while he was in Colombia, he obtained information about counterfeit currency and drugs from a person named Tony. So in that short blurb within the plea agreement, and that's on page 005 of the excerpt of the record or page 5 of the plea agreement, we know that Standow told the United States Secret Service that he had traveled to Colombia, he had traveled there at the direction of Jason Schulwitz, the ringleader of the overarching conspiracy, and that he had met with a contact going by the name of Tony who had offered or talked about counterfeit currency and drugs. We know that. Now, there was an initial draft of the plea agreement in which the government asked my client to agree that he had obtained counterfeit currency and drugs from Tony, and he objected to the characterization of obtaining drugs because he had told him, I brought that scuba gear, but I don't know to this day whether there were drugs in it or not. Just a minor correction. The government initially indicted my client for three counts all relating to five kilos. Possession, conspiracy to possess, and importing, all with five kilos. The jury just didn't believe the testimony and checked the 500-gram box on possession and importing because Todd Shipman, who had twice indicated my client was not guilty, recanted and said he saw him take 11 pounds of coke from the scuba gear. The jury, I take it, thought that that was a bit of a geometrical problem and didn't believe that testimony. But with respect to the plea agreement, we have the United States government coming in and questioning my client on all aspects of anything within the plea agreement. Now, the plea agreement has language about drugs. They did question him about drugs. They asked him to identify Tony. They asked him to identify Jason. He talked to them about both of that. The overarching conspiracy involved both drugs and counterfeit money, as the government repeatedly asserted. Mr. Beatty, the plea agreement doesn't contain an express provision about immunity. And as Judge Reveley's questioning pointed out, the case you cite, U.S. v. Duden, two express promises were made to the defendant that whatever she said would not be used against her. They have no such circumstance in this case, right? I believe that the no additional charges amounts to a formal written promise that there would be no additional charges. That is an express promise to my mind. It's not oral and it's probably too oblique in its language. But that's exactly how my client looked at it, is that I can talk about the drug stuff because they're agreeing not to file any additional charges. Now, to say that months later in front of the grand jury, which they asked him to testify against other defendants, they told him, now you're on the hook, at that point he doesn't know what to do. His lawyers told him, you're free and clear, this provision is. They've already asked him about the drugs. They've already asked him about Jason Shulwitz. They've asked him to identify in a photograph the participants in the overarching conspiracy. They even had him go into Jason Shulwitz's house and bring out photographs. Now, how is it that when we get to the time of severance, they say you can't sever because it's all one big conspiracy? Why is it that at sentencing, as Judge Tashima, you exactly pointed out, they argued he should be sentenced under this overarching conspiracy? Where did they even get the five kilos? That came from the overarching conspiracy. There's no way this man brought five kilos into the country. The jury didn't believe that. So all of this came from the idea that they were going to tar and feather him with a broader conspiracy, and this is their language. These issues are very intertwined, Your Honor. They are part and parcel of what was going on here. All of the parties here were involved in both the counterfeit currency, and they were also involved in cocaine. He uses the word involve. That's their lawyer. That's the U.S. government saying this overarching conspiracy involves two things, counterfeiting and drugs. The language, the wording involve is exactly the language in the plea agreement, involve. Did they understand the government to say that after he testified before the grand jury, they asked him to go in and testify? Correct. That they didn't use any of that, they agreed not to use any information? That is what the government said. They agreed not to use any of his testimony in front of the grand jury. They didn't agree not to use anything else, apparently. And, in fact, during Didn't the court prevent him from using the ID information? I believe that the court, I'm not remembering that, I apologize. I know that the court wouldn't allow them to show photographs of the counterfeit bills stacked up, because the court found that prejudicial. But just about everything else concerning the earlier counterfeiting thing came in. Something about identity of the other individual. There was something, and I'm not remembering if it was a courtroom identification Yes. That's correct. You're remembering correctly. There was something to that effect. But just about everything else from the whole overarching conspiracy came in, and including all the stuff relating to the earlier counterfeit. They had no physical evidence in this case concerning drugs, but they basically got the jury to believe he was part of the overarching conspiracy. The part of your argument here is that the government should not have been allowed to bring additional charges beyond the counterfeit. That's a fair characterization. I made both arguments, but I agree. The thrust is they should not have been allowed to bring these three additional charges. All right? And I think the Apprendi arguments are already fully mapped out. I would simply say that when the court got rid of that count, that put us in a position, exactly as Judge Tashima said, of having a de minimis, or maybe it was you, Judge, of having a de minimis or zero amount of drugs. So then when the judge then went on at his exercise of judicial fact-finding, he raised it then from a de minimis amount to 2 to 3.5 pounds, which had the effect of raising the maximum sentence from 30 years to life. But even under D1C, he would have been eligible for, with his prior conviction, he would have been eligible for a maximum of 30 years. That's correct. But he ended up getting 10. I agree. I can't. And it's pretty much harmless. Okay. You know, I was worried about the harmless error, but being fairly new to criminal stuff, I figured I should map it out. But if that's the judgment, then I can't disagree that he was given 10 years on all three counts. Thank you for your time, Your Honor. It was an honor being in front of you. Thank you. We thank both counsel. This case is submitted for decision.
judges: Reavley, Tashima, Paez